FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**October 28, 2025**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert
Clerk of Court**

———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CLOVER MCGREGOR,

    Defendant - Appellant.

No. 23-1399

———————————————————

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:23-CR-00220-PAB-1)**

———————————————————

Perrin Tourangeau, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Office of the Colorado Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Jess D. Mekeel, Assistant United States Attorney (Matthew T. Kirsch, Acting United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

———————————————————

Before **HOLMES**, Chief Judge, **CARSON**, and **ROSSMAN**, Circuit Judges.

———————————————————

**HOLMES**, Chief Judge.

———————————————————

    Defendant-Appellant Clover McGregor appeals from the denial of his motion

to suppress evidence and challenges the constitutionality of his statute of conviction.

In March 2023, two officers stopped Mr. McGregor's vehicle for speeding. During

the traffic stop, the officers (1) saw Mr. McGregor dramatically lean over to the passenger's side of his vehicle to the extent that the officers could no longer see his body, (2) recognized Mr. McGregor as a member of a local criminal gang, and (3) heard Mr. McGregor state that he was on parole for robbery. The officers thereafter asked Mr. McGregor to leave his vehicle, patted him down, and searched the passenger seat, finding a firearm. Mr. McGregor was charged with possession of a firearm as a felon under 18 U.S.C. § 922(g)(1).

Mr. McGregor filed a motion to suppress the evidence obtained in the vehicle search, arguing the warrantless search of his vehicle violated his Fourth Amendment right to be secure against unreasonable searches. The government responded that the vehicle search fell within the officer safety exception that the Supreme Court recognized in *Michigan v. Long*, 463 U.S. 1032 (1983). Determining the search was permissible under the officer safety exception because the officers had reasonable suspicion that Mr. McGregor was armed and dangerous, the district court denied the motion to suppress. The district court primarily rested its conclusion on three factors arising from the traffic stop—*viz.*, (1) Mr. McGregor's "furtive movement" in his vehicle, (2) Mr. McGregor's criminal gang affiliation, and (3) Mr. McGregor's robbery conviction. Mr. McGregor subsequently entered a conditional plea of guilty, reserving his right to appeal from the district court's order denying his motion to suppress.

Now, on appeal, Mr. McGregor argues that the district court erred in denying his motion to suppress because the officers lacked reasonable suspicion that

2

Mr. McGregor was armed and dangerous. Separately, he challenges the constitutionality of his statute of conviction—§ 922(g)(1).

For the reasons discussed herein, we reject both of Mr. McGregor's challenges and **affirm** the district court's judgment.

## I

## A

On March 14, 2023, while patrolling a residential area in Aurora, Colorado in the daytime, two police officers in the Aurora Police Department's Gang Intervention Unit—Officer Roch Gruszeczka and Officer David Jaworowski—stopped a white Nissan car on suspicion of speeding.[1] Mr. McGregor, who at the time was twenty-four years old, was driving the white Nissan.[2] The speed limit at the scene was 25 miles per hour, and the officers estimated that Mr. McGregor's vehicle was traveling at 50 miles per hour based on their pacing of his vehicle.

After following Mr. McGregor's vehicle for a few blocks, Officer Gruszeczka activated the police vehicle's lights and siren. Soon after, Officer Gruszeczka observed the driver of the white Nissan "leaning to the left and then leaning to the

---

[1]     We state the facts in the light most favorable to the district court's decision because Mr. McGregor appeals from the district court's order denying his motion to suppress. *See United States v. Samilton*, 56 F.4th 820, 823 n.2 (10th Cir. 2022); *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020).

[2]     Although the vehicle belonged to Mr. McGregor's girlfriend, the government recognized in the district court that Mr. McGregor had standing to challenge the search of the vehicle. For simplicity's sake, we refer to the vehicle as belonging to Mr. McGregor.

right, and at one point lean[ing] so far over to the right that [Officer Gruszeczka] couldn't even see the driver of the vehicle." R., Vol. III, at 131 (Mot. to Suppress Hr'g Tr., dated Jan. 29, 2024). Similarly, Officer Jaworowski noted that the driver "leaned way over to the passenger's side" and that "this was a dramatic lean-over that [was] frantic and abrupt." *Id.* at 137. Specifically, Officer Jaworowski observed that the driver "got his whole body over the console moving over to the right such that at one point in time he [(i.e., Officer Jaworowski)] couldn't see the [driver]." *Id.* This movement caused both officers to harbor personal safety concerns, and, more specifically, Officer Gruszeczka was "worried that the driver was either concealing or attempting to conceal something or retrieving something from the passenger's side of the car." *Id.* at 131. Mr. McGregor's vehicle eventually came to a stop.[3]

Both officers opened their respective doors and approached the white Nissan— Officer Gruszeczka from the driver's side and Officer Jaworowski from the passenger's side. Officer Gruszeczka noticed that the driver had put his hands and head outside of the vehicle, which made Officer Gruszeczka feel "uneasy" because he thought the driver was tracking his location. *Id.* at 132. Officer Gruszeczka indicated to the driver that he had been speeding.

---

[3]    The officers offered conflicting accounts on how long Mr. McGregor's vehicle took to stop. Officer Gruszeczka stated that the vehicle "didn't stop right away," whereas Officer Jaworowski said that the vehicle pulled over "abruptly." R., Vol. III, at 13, 68. Mr. McGregor's counsel stated at the suppression hearing that the vehicle took seventeen seconds to stop. The district court did not resolve this factual dispute and did not make any direct factual finding as to the precise length of time it took the vehicle to stop.

4

As he approached the vehicle, Officer Gruszeczka recognized the driver as

Mr. McGregor, whom Officer Gruszeczka had seen in the past year at two different

funerals of members of a local criminal gang, called the Seanville; these funerals

were attended by ten to fifteen gang members.  The Seanville gang was an

"extremely violent criminal street gang involved in armed robberies, car jackings,

high speed pursuits[,] and aggravated assaults involving weapons" in Aurora.  *Id.*,

Vol. II, at 14 (Police Report, dated Mar. 15, 2023).

Officer Gruszeczka believed that Mr. McGregor was a Seanville gang member

based, not only on Mr. McGregor's presence at these funerals, but also on Officer

Gruszeczka's familiarity with Mr. McGregor's public social-media profile, and

Officer Gruszeczka's interviews with known Seanville gang members.[4]  Officer

Jaworowski also recognized Mr. McGregor "because he had seen photographs of

him . . . in the intel database as a local gang member."  *Id.*, Vol. III, at 137–38.

Officer Jaworowski later noted, given his training and experience, that "local gang

members are typically armed."  *Id.* at 138.

When Officer Gruszeczka began questioning Mr. McGregor, Mr. McGregor

revealed that he was on parole for robbery and that he was driving to a urinalysis

---

[4]    Officer Gruszeczka testified regarding his interviews with Seanville gang members and Mr. McGregor's social media profile during Mr. McGregor's suppression hearing.  Though the district court did not specifically reference these facts in its findings of fact, we rely on them because there is no dispute about them on appeal and because we consider the record facts in the light most favorable to the district court's decision denying the motion to suppress.  *See Samilton*, 56 F.4th at 823 n.2.

appointment pursuant to his parole conditions. Officer Gruszeczka, who at this point was positioned at the driver's side window, subsequently asked Mr. McGregor for his driver's license. Mr. McGregor began "reaching all around in different areas" with his hands inside the car. *Id.* at 133. Officer Gruszeczka remarked that Mr. McGregor's reaching was making him nervous. Mr. McGregor's wallet was on his lap, and Officer Gruszeczka believed that it was unusual for Mr. McGregor to be reaching around because usually a person would know where his driver's license is located.[5]

Officer Gruszeczka then asked Mr. McGregor to place his hands behind his head and step out of the car, and Mr. McGregor did so. Officer Gruszeczka patted Mr. McGregor down for weapons, and after finding none, asked him to sit down on the curb next to the car. By that time, two additional officers had arrived at the scene. Officer Jaworowski subsequently searched the passenger seat and gave the other officers a signal that he had found a gun. Thereafter, Officer Gruszeczka placed Mr. McGregor in handcuffs, and Officer Jaworowski read him his *Miranda* rights.[6]

---

[5]    In fact, Mr. McGregor's driver's license was in his pants pocket and not in the wallet on his lap.

[6]    Throughout his interaction with the officers, Mr. McGregor did not appear scared or nervous but instead looked comfortable.

**B**

After his arrest, Mr. McGregor was charged with one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Mr. McGregor filed a motion to suppress, seeking to prevent the government from using evidence discovered from the search of his vehicle.[7] The government opposed his motion, contending that the officers had reasonable suspicion that Mr. McGregor was armed and dangerous such that the officers' search of his vehicle was permissible under the officer safety exception to the Fourth Amendment.

The district court held an evidentiary hearing on Mr. McGregor's motion to suppress. In the hearing, the district court heard testimony from Officers Gruszeczka and Jaworowski. At the conclusion of testimony, the district court first outlined its findings of fact, crediting much of the testimony of the officers. The district court ultimately concluded that the warrantless search of Mr. McGregor's vehicle fell within the exception for protective sweeps for officer safety.

More specifically, the district court found that the officers had reasonable suspicion that Mr. McGregor was armed and dangerous based primarily on the combination of three factors: (1) Mr. McGregor's dramatic, furtive[8] movement

---

[7]    Mr. McGregor also argued in the district court that there was no reasonable suspicion to stop the vehicle and that the officers effectively arrested him without probable cause. Both of these challenges were denied by the district court during the evidentiary hearing on Mr. McGregor's motion to suppress, and neither of these challenges is at issue on appeal.

[8]    The district court did not characterize this movement as "furtive," but the parties both classify the movement as such for purposes of analysis.

toward the passenger-side of his vehicle while he was being stopped[9]; (2) the officers' recognition that Mr. McGregor was a criminal gang member, and Officer Jaworowski's belief that local gang members were typically armed; and (3) Mr. McGregor's admission that he was on parole for robbery. Summarizing its conclusion, the district court stated that "when you look at those factors objectively, a reasonable person would conclude that the defendant may be armed and dangerous[,] thus justifying a protective sweep." *Id.* at 145.

Mr. McGregor entered a conditional plea of guilty, reserving his right to appeal from the district court's order denying his motion to suppress. The district court subsequently sentenced him to thirty-seven months in prison.

### C

Mr. McGregor now appeals from the district court's order denying his motion to suppress, arguing that the warrantless search of his vehicle violated his Fourth Amendment right to be secure against unreasonable searches. He also contends that his statute of conviction—18 U.S.C. § 922(g)(1)—is unconstitutional under the Second Amendment.

---

[9]    The district court's discussion of Mr. McGregor's allegedly suspicious movements only included his movement toward the passenger seat *before* officers arrived next to his vehicle; it did not include Mr. McGregor's reaching movements after Officer Gruszeczka began questioning him.

We have jurisdiction pursuant to 28 U.S.C. § 1291. The district court entered final judgment on December 18, 2023, and Mr. McGregor timely filed his notice of appeal the same day.

## II

Mr. McGregor raises two challenges on appeal. First, he argues that the search of his vehicle "[violated] his Fourth Amendment rights" because "[t]he facts known to the officers at the time of the protective search did not provide reasonable grounds to believe that Mr. McGregor was armed and dangerous, whether considered separately or in conjunction." Aplt.'s Opening Br. at 11–12. Second, he argues that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment.

We address each argument in turn. And we conclude that both of Mr. McGregor's challenges are unavailing.

## A

We first evaluate Mr. McGregor's challenge to the denial of his motion to suppress.

## 1

We "review[] de novo a district court's determination of the reasonableness of a search and seizure under the Fourth Amendment." *United States v. Dennison*, 410 F.3d 1203, 1207 (10th Cir. 2005). "We look at the totality of the circumstances in reviewing the denial of the motion to suppress." *Id.* Moreover, "we view the evidence in the light most favorable to the government" and "accept the district court's finding of fact unless clearly erroneous." *United States v. Canada*, 76 F.4th

1304, 1307 (10th Cir. 2023) (quoting *United States v. Windom*, 863 F.3d 1322, 1326 (10th Cir. 2017)). "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* (quoting *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017)). "In making this determination, we keep in mind that '[i]t is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference.'" *Hernandez*, 847 F.3d at 1263 (alteration in original) (quoting *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999)). In addition, "[r]eviewing courts must also defer to the 'ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" *Dennison*, 410 F.3d at 1207 (quoting *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005)).

In conducting the reasonable suspicion analysis, we first individually analyze the probative value of each of the relevant factors that the district court relied upon, and then, viewing them collectively and in the context of the totality of the circumstances, we determine whether those factors support a finding of reasonable suspicion. *See United States v. Gurule*, 935 F.3d 878, 885 (10th Cir. 2019) ("We evaluate each factor alleged to support an inference of reasonable suspicion separately and in the aggregate."); *United States v. Garcia* (*"Garcia II"*), 751 F.3d 1139, 1144 (10th Cir. 2014) ("We first analyze each of the factors . . . . [and] then present a totality of the circumstances analysis."); *cf. United States v. Daniels*, 101

10

F.4th 770, 784 (10th Cir. 2024) ("Here, the district court avoided the improper process . . . . It analyzed each factor individually, but it was clear that it would consider all the facts in its totality analysis . . . .").

**2**

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Windom*, 863 F.3d at 1327 (alteration in original) (quoting U.S. CONST. amend. IV). A vehicle is an "effect" protected by the Fourth Amendment. *Byrd v. United States*, 584 U.S. 395, 403 (2018).

"While we generally require officers to have a warrant to search, a warrantless search is reasonable in some situations—including certain protective sweeps of vehicles." *Canada*, 76 F.4th at 1307. More specifically, one of those situations is when a search is necessary for officer safety. *See Long*, 463 U.S. at 1049–50. Such protective sweeps are limited, however, "to those areas in which a weapon may be placed or hidden." *Id.* at 1049. Law enforcement officers may only take steps that are "reasonably necessary to protect their personal safety." *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).

Pursuant to the officer safety exception, "[t]o lawfully conduct a protective sweep, an officer must have reasonable suspicion that a suspect [(1)] poses a danger and [(2)] may gain immediate access to a weapon." *Canada*, 76 F.4th at 1307. For the first element, "the government must show that a reasonable officer would believe

11

the suspect to be 'presently dangerous.'" *Id.* (quoting *Long*, 463 U.S. at 1047). For the second element, "the officer [must] have had 'reason to believe that weapons may be found' in the vehicle." *Id.* at 1307–08 (quoting *Dennison*, 410 F.3d at 1212). "In analyzing whether this reasonable suspicion standard is met, we are 'to view the officer's conduct through a filter of common sense and ordinary human experience.'" *United States v. Garcia* (*"Garcia I"*), 459 F.3d 1059, 1064 (10th Cir. 2006) (quoting *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir. 1995)).

"Reasonable suspicion demands less than probable cause," but "[i]t 'requires the officer to act on "something more than an inchoate and unparticularized suspicion or hunch."'" *Canada*, 76 F.4th at 1307 (quoting *United States v. Hauk*, 412 F.3d 1179, 1186 (10th Cir. 2005)). Importantly, reasonable suspicion "is not meant to be[] an onerous standard." *United States v. Samilton*, 56 F.4th 820, 827 (10th Cir. 2022) (quoting *Shaw v. Schulte*, 36 F.4th 1006, 1014 (10th Cir. 2022)).

**3**

Mr. McGregor argues that the district court should have disallowed the government from using the evidence seized from the search of his vehicle because the officers "lacked reasonable suspicion that Mr. McGregor was armed and presently dangerous." Aplt.'s Opening Br. at 16. He addresses each of the three factors that the district court relied on in support of its denial of his motion to suppress individually and in their totality, ultimately concluding that they are insufficient to support a finding of reasonable suspicion.

The government counters that the protective sweep was "objectively reasonable based on several factors." Aplee.'s Resp. Br. at 9. It argues that the three factors relied upon by the district court, along with other factors "supported by the undisputed evidence, but not specifically listed by the district court," gave the officers reasonable suspicion that Mr. McGregor was armed and dangerous. *Id.* at 10.

In our analysis, we first individually analyze each of the three factors that the district court relied upon before analyzing those factors and the other evidence in the totality. *See Gurule*, 935 F.3d at 885.

**a**

We first evaluate the probative value of Mr. McGregor's furtive movement. In support of its finding of reasonable suspicion that Mr. McGregor was armed and dangerous, the district court referred to Officer Jaworowski's testimony that he saw Mr. McGregor "leaning over to the right in a way that [Officer Jaworowski] thought was unusual and which he considered to be dangerous because typically people will be trying to disassociate themselves with either contraband or what [Officer Jaworowski] feared [to be] a weapon." R., Vol. III, at 145. As part of its findings of fact, the district court also credited Officer Gruszeczka's observation that Mr. McGregor was "leaning to the right, and at one point leaned so far over to the right that [Officer Gruszeczka] couldn't even see the driver of the vehicle." *Id.* at 131.

**i**

Mr. McGregor argues that the movement that the district court highlighted did not create an inference that he was armed and presently dangerous. In his analysis, however, Mr. McGregor does not challenge any of the district court's factual findings as clearly erroneous.

Mr. McGregor first asserts instead that furtive movements alone cannot establish reasonable suspicion. He then contends that "the specific nature of the furtive movement at issue is critical" and argues that a reach into the passenger side of the vehicle is readily susceptible to many innocent explanations. Aplt.'s Opening Br. at 20–22. For illustration, Mr. McGregor suggests that a driver who makes such a movement might "be throwing a piece of trash to the back of the floorboard, righting a spilled drink or a bag that has tipped over, [] grabbing his wallet that bounced off the passenger seat as he flew over a speed bump," or "be[] trying to hide . . . smelly gym socks, prescription medication, or an embarrassing magazine." *Id.* at 21–22.

Finally, Mr. McGregor avers that, due to the timing of his movement, it was not as dangerous as other cases where we have found reasonable suspicion. Specifically, he notes that the "reach into the passenger area occurred *before* the officers had even exited their vehicle, and [Mr. McGregor] did not move toward the passenger side of the vehicle again during his encounter with police." *Id.* at 23.

The government responds that Mr. McGregor's furtive movement was highly probative of reasonable suspicion, arguing that just as Mr. McGregor could have been making an innocent action through his movement, he could equally have been

14

"hiding a loaded handgun." Aplee.'s Resp. Br. at 13. The government also argues that our circuit has never held in a published opinion that furtive movements alone cannot establish reasonable suspicion.

**ii**

Whether a defendant makes "[f]urtive movements" in the presence of police is an "appropriate factor[] to consider in determining whether reasonable suspicion exists." *United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009); *accord Samilton*, 56 F.4th at 828. Even assuming, as Mr. McGregor contends on appeal, that a furtive gesture alone would not amount to reasonable suspicion, that argument has no persuasive force here, where additional factors support reasonable suspicion under the circumstances before us.

Many suggestive actions by a defendant can be deemed "furtive" and can support a reasonable suspicion finding. For example, in *Dejear*, we recognized the defendant's action of "stuffing both hands down into the car seat as though he was trying to conceal something" as a furtive movement that provided support to a reasonable suspicion finding. *See* 552 F.3d at 1200–01. Similarly, in *Canada*, we found that the defendant made a furtive movement when he "reached behind his seat as the officers approached the vehicle" with his "hips lifted from the seat, arm extended, [and] head turned back"; we ultimately found that this movement, along with the defendant's 14-second "slow roll" stop as officers approached, sufficiently established reasonable suspicion. 76 F.4th at 1309. And lastly, in *Samilton*, a defendant's "movements . . . towards the floorboard area towards his knees[] [and]

15

multiple hand movements" were deemed "furtive"—indicative of an attempt to "hide

a firearm"—and ultimately contributed to a reasonable suspicion finding.  56 F.4th at

824, 828–29 (quoting record).

Our sister circuits also have found that furtive movements can contribute to a

reasonable suspicion finding in similar or analogous contexts.  In *United States v.*

*Graham*, 483 F.3d 431 (6th Cir. 2007), a defendant's "dip with his right shoulder

toward the floor as if he was placing something under his seat" immediately before

officers approached his vehicle constituted a "furtive movement [] consistent with an

attempt to conceal a firearm" and helped establish the requisite level of reasonable

suspicion for a vehicle search.  *Id.* at 439–40.  Similarly, in *United States v.*

*Kenerson*, 585 F.3d 389 (7th Cir. 2009), a defendant's "furtive movement with his

shoulders that made [an officer] concerned about the possible presence of a weapon

in the car" lent support to a reasonable suspicion finding for a *Terry* frisk.[10]  *Id.* at

393.  Finally, in *United States v. Soares*, 521 F.3d 117 (1st Cir. 2008), reasonable

suspicion for a pat-down search was found in part because the officers saw two

---

[10]    *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) ("[T]here must be a narrowly
drawn authority to permit a reasonable search for weapons for the protection of the
police officer, where he has reason to believe that he is dealing with an armed and
dangerous individual, regardless of whether he has probable cause to arrest the
individual for a crime."); *see also United States v. Hammond*, 890 F.3d 901 (10th Cir.
2018) (noting that "[t]he reasonableness of a pat-down search during an investigative
detention is governed by the Supreme Court's analysis in *Terry*").  We may rely on
decisions analyzing reasonable suspicion to conduct a protective search of one's
person under *Terry* because *Long* merely extended *Terry* to automobiles.  *See Long*,
463 U.S. at 1049–50 (authorizing "*Terry* search[es] of . . . automobile[s]").

individuals, including the defendant, "bend over toward their left, as if putting something on the floor, which the officers testified were 'furtive movements' and were 'not ordinary.'" *Id.* at 120–21 (quoting record).

In none of these cases—either from our circuit or our sister circuits—were the furtive movements alone treated as sufficient for a finding of reasonable suspicion that a defendant was armed and dangerous. Yet these cases establish that furtive movements, when viewed in conjunction with other factors, can be significantly probative concerning the issue of reasonable suspicion.

**iii**

Here, Mr. McGregor's "furtive" movement to the right after he was stopped by officers significantly supports a finding of reasonable suspicion that he was armed and dangerous. As highlighted by the district court, after officers turned their lights and siren on to stop Mr. McGregor for speeding, he leaned over to the passenger side of his vehicle to such an extent that he escaped the view of the officers. The district court credited Officer Jaworowski's testimony that this movement was "dramatic[,] . . . frantic[,] and abrupt," such that Mr. McGregor could have been concealing or retrieving a weapon, and the court similarly credited Officer Gruszeczka's testimony that he was "worried that the driver was either concealing . . . something or retrieving something from the passenger's side of the car." R., Vol. III, at 131, 137, 145. Considering Mr. McGregor made this "dramatic" movement as soon as the officers turned their lights on to stop him, a reasonable officer could have found that the movement was "furtive" and suggestive of an

17

attempt to conceal or retrieve a weapon. *See, e.g.*, *Samilton*, 56 F.4th at 823 n.2 (assessing the record facts in the light most favorable to the district court's decision denying the motion to suppress).

Furthermore, Mr. McGregor's actions are factually analogous to cases where our court and our sister courts have found furtive movements to be supportive of a reasonable suspicion finding. Like the actions of the defendant in our case, *Canada*—who reached behind his seat with his hips lifted and arm extended as officers approached his vehicle, 76 F.4th at 1309—Mr. McGregor made a "dramatic" movement toward the passenger side of his vehicle to the point where he was no longer visible.

Moreover, Mr. McGregor's movement was far more exaggerated than those of the defendant in another one of our cases, *Samilton*; there, the defendant simply moved toward the floorboard area of his vehicle and made multiple hand movements. *See* 56 F.4th at 828. And Mr. McGregor's movement toward the floor area of the passenger seat is nearly identical to the defendants' actions in both *Graham* from the Sixth Circuit—where the defendant made a "dip with his right shoulder toward the floor," 483 F.3d at 439, and *Soares* from the First Circuit—where the defendant bent toward the left, as if putting something on the floor, 521 F.3d at 120–21. Given the similarity between Mr. McGregor's furtive movement and those of defendants whose furtive movements supported a reasonable suspicion finding, his movement here should similarly weigh toward a finding of reasonable suspicion that he was armed and dangerous.

18

Mr. McGregor's attempts to minimize the probative weight of his furtive movement are unavailing. First, he argues that his movement was readily susceptible to numerous innocent explanations, including spilling a drink or grabbing his wallet. But the officers determined that his movement did not appear innocent, and they testified that the movement caused them to feel that their safety was threatened because it appeared as if Mr. McGregor was hiding or retrieving something. As a matter of law, we "defer to the 'ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" *Dennison*, 410 F.3d at 1207 (quoting *Santos*, 403 F.3d at 1124). To be sure, "[t]he deference owed to the officer's judgment[] . . . is not unlimited," *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010), but Mr. McGregor gives us no reason to take the extraordinary step of overriding that deference here. Indeed, the district court made numerous factual findings crediting the officers' testimony, and we "accept the district court's finding of fact unless clearly erroneous." *Canada*, 76 F.4th at 1307. Recall that Mr. McGregor does not challenge any of the district court's factual findings as clearly erroneous. And we have no basis otherwise to conclude that the district court clearly erred in crediting the officers' testimony that Mr. McGregor's movement appeared suspicious. *See Hernandez*, 847 F.3d at 1263 ("A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." (quoting *In re Vaughn*, 765 F.3d 1174, 1180 (10th Cir. 2014))).

Moreover, in the factually analogous cases cited *supra*, each of the defendants' actions could have been explained away by positing a series of innocent actions that the movements could have constituted. Nevertheless, in each of the foregoing cases, the courts credited the officers' characterization of the movements as suspicious. We do so here as well. *See, e.g.*, *Canada*, 76 F.4th at 1307; *Dennison*, 410 F.3d at 1207.

Second, Mr. McGregor argues that his movement should be given little probative value because it occurred *before* the officers had exited their vehicle and because he did not continue the movement after the officers arrived next to his vehicle. But a defendant's furtive movements need not occur as an officer is next to the vehicle for the movements to support a reasonable suspicion finding. *See Canada*, 76 F.4th at 1309 (involving a defendant's furtive movements as police approached his vehicle); *Graham*, 483 F.3d at 439 (involving furtive movements immediately before officers approached defendant's vehicle); *Soares*, 521 F.3d at 120–21 (concerning two individuals who made furtive movements before officers arrived next to the vehicle).

And Mr. McGregor does not cite any authority supporting his position that furtive movements occurring before officers depart their vehicle are less probative in the reasonable suspicion inquiry than those occurring after officers leave their vehicle. Indeed, it is a matter of common sense that a furtive movement can occur at any moment during a traffic stop and subsequent encounter with police; at bottom, the salient question is whether a furtive movement was made in response to the presence of police. *See United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir. 2001)

20

("[F]urtive gestures 'are significant only if they were undertaken in response to police presence.'" (quoting *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000))).

Relatedly, Mr. McGregor's claim that he did not move toward the passenger seat again during his encounter with police does nothing to advance his cause. Again, drawing on common sense, probably the time that a defendant would be least likely to make a furtive gesture would be when the defendant's actions are plainly visible by law enforcement. As such, courts routinely have evaluated the probative weight of furtive movements that occur in the period *before* officers fully arrive next to the vehicle, as opposed to when the defendants are in the midst of a face-to-face conversation with the police. *See, e.g.*, *Canada*, 76 F.4th at 1309; *Graham*, 483 F.3d at 439; *Soares*, 521 F.3d at 120–21.

Accordingly, we conclude that Mr. McGregor's furtive movement weighs in favor of the district court's finding of reasonable suspicion.

**b**

We next consider Mr. McGregor's alleged gang membership. Specifically, the second factor the district court relied on for its finding of reasonable suspicion was the officers' testimony that they both "recognized [Mr. McGregor] as being a gang member" and also Officer Jaworowski's testimony that "in his experience most of the local gang members are armed." R., Vol. III, at 142. Further, in its findings of fact, the district court credited Officer Gruszeczka's testimony that he had seen Mr. McGregor at two different Seanville gang funerals in the past year and Officer

21

Jaworowski's testimony that he had seen Mr. McGregor's face in an intel database[11] as a local gang member.

**i**

Mr. McGregor argues that we should place "limited probative value" on the fact that the officers recognized him as a criminal gang member while approaching his vehicle. Aplt.'s Opening Br. at 27. He raises two arguments in support of this position. First, he claims that, to be probative, gang membership must be accompanied by facts that the suspect is currently engaged in gang-related activity. Mr. McGregor offers examples of indicators of an individual's contemporaneous engagement in gang activity—*viz.*, wearing gang colors, announcing gang affiliation, and being proximate to other known gang members or criminal activity at the time of the police encounter. He points out that none of these contemporaneous markers were present during his traffic stop.

Second, Mr. McGregor argues that the evidence of his alleged gang membership was weak because the officers only recognized Mr. McGregor as a gang member based on witnessing him at a funeral where gang members were present and recognizing him from a vague knowledge database. He contrasts this evidence with more robust evidence of gang membership in cases like *United States v. Hammond*,

---

[11] At the suppression hearing, Officer Jaworowski clarified that this "intel database" was not a physical database but instead "a knowledge base" of "local gang members and active members of criminal street gangs." R., Vol. III, at 60. The district court referred to the database as an "intel database" in its findings of fact, *id.* at 137, and Mr. McGregor does not challenge this finding of fact on appeal.

890 F.3d 901 (10th Cir. 2018), where the defendant was "flagged in an internal police database as 'a documented gang member.'" *Id.* at 30 (quoting *Hammond*, 890 F.3d at 903).

In response, the government argues that "[t]he possibility that a gang member is armed cannot hinge on his attire," Aplee.'s Resp. Br. at 16, and cites *Garcia I*, 459 F.3d 1059, and *United States v. Torres*, 987 F.3d 893 (10th Cir. 2021), as two cases where a defendant's gang-affiliation was relevant even though the defendant was not wearing gang attire. Additionally, the government notes that Mr. McGregor failed to object to the officers' testimony before the district court or argue that the district court's factual findings related to Mr. McGregor's gang membership were clearly erroneous.

**ii**

Gang affiliation can support a finding of reasonable suspicion that an individual is armed and dangerous. *See Garcia I* , 459 F.3d at 1067 ("Although not necessarily determinative by itself, [] gang connection further supports the reasonableness of a weapons frisk of those present . . . ."); *accord United States v. Guardado*, 699 F.3d 1220, 1223 (10th Cir. 2012); *see also United States v. Santio*, 351 F. App'x 324, 329 (10th Cir. 2009) ("[U]nder certain circumstances [gang affiliation] may be an appropriate factor in determining if reasonable suspicion exists

23

for a detention or search.").[12]  Specifically, the presence of gang affiliation can allow

officers to reasonably determine that an individual is armed.  *See Garcia I*, 459 F.3d

at 1062 (finding reasonable suspicion while crediting an officer's testimony that

"guns are often part of the gang environment" and that "[i]n our society today this

observation resonates with 'common sense and ordinary human experience'"

(quoting *Alvarez,* 68 F.3d at 1244)).

In *United States v. Hammond*, a defendant's status as a "known gang

member"—established by his presence in a police management system of gangs—

contributed to a finding of reasonable suspicion that the defendant was armed and

dangerous.  890 F.3d at 903, 907–08.  Similarly, in *United States v. Guardado*, the

fact that a defendant was wearing clothing associated with a gang supported a

reasonable suspicion finding.  *See* 699 F.3d at 1223–25.  And in *United States v.*

*Torres*, we concluded that there was reasonable suspicion for a pat-down search in

part because "the police believed that [the defendant] was a gang member."  987 F.3d

at 905.

Some of our sister circuits have similarly deemed gang affiliation to be

probative of a finding of reasonable suspicion that an individual is armed and

dangerous.  *See, e.g.*, *United States v. Gist-Davis*, 41 F.4th 259, 265 (4th Cir. 2022)

(finding officers were justified in concluding that the defendant was armed and

---

[12]       We rely on unpublished cases exclusively for their persuasive value and do not treat them as binding precedent.  *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

presently dangerous "given his membership in a violent gang whose members often carry weapons"); *United States v. Flett*, 806 F.2d 823, 828 (8th Cir. 1986) (finding reasonable suspicion in support of a *Terry* frisk in part because the defendant was dressed in gang colors and his appearance matched that of a gang member); *United States v. Miranda*, 393 F. App'x 243, 246 (5th Cir. 2010) (per curiam) (concluding that an officer had reasonable suspicion that a defendant was armed and dangerous in part because the defendant was "a gang member in a violent gang" and was "wearing gang colors").

We acknowledge that an implicit condition in our cases where gang affiliation was identified as a factor supporting a reasonable suspicion determination was that the officers must have some objective basis for believing that the suspect is contemporaneously or recently associated with a criminal gang. That objective basis could be established in various ways, including by evidence that an individual is present in a police intelligence database of known gang members. *See Hammond*, 890 F.3d at 903–06. And it also could be established by evidence that the suspect was wearing gang attire at the time he is stopped by police. *See Guardado*, 699 F.3d at 1223–24; *Santio*, 351 F. App'x at 329. And that condition makes sense because it is only when the evidence points to contemporaneous or recent gang association that the evidence could logically lead a reasonable officer to infer that the suspect may be presently armed and dangerous. *Cf. United States v. Roach*, 582 F.3d 1192, 1201 n.5 (10th Cir. 2009) (noting that "evidence of past gang membership, by itself, does not

25

support even a reasonable suspicion of a crime").[13]  And critically, a defendant's

gang affiliation must be accompanied by other factors to ultimately support a

reasonable suspicion finding.  *See Hammond*, 890 F.3d at 906 ("Standing alone, . . .

suspected gang affiliation—'is not sufficient to create reasonable suspicion of

anything[.]'" (alteration in original) (quoting *United States v. Rice*, 483 F.3d 1079,

1085 (10th Cir. 2007))); *Torres*, 987 F.3d at 904 ("As [the defendant] argues,

reasonable suspicion does not arise solely from his criminal record or gang

affiliation.").

### iii

We conclude that the officers' objectively grounded belief that Mr. McGregor

was a member of a criminal gang supported their reasonable suspicion that

Mr. McGregor was presently armed and dangerous.  Both officers testified that they

recognized Mr. McGregor as being part of a gang—specifically the local Seanville

gang, a violent criminal gang operating in Aurora.  Mr. McGregor's apparent gang

membership heightened Officer Jaworowski's suspicion that he was potentially

armed and dangerous because "in his experience most of the local gang members

[were] armed," R., Vol. III, at 142, and this suspicion was reasonable under our

---

[13]    Take, for example, the hypothetical suspect who several years prior disavowed his association with a criminal gang: he currently does not associate with the gang; and the police have no intelligence in their gang database to the contrary. In such a circumstance, the suspect's historic connection to the gang should logically and reasonably have virtually no probative value on the question of whether that suspect is presently armed and dangerous.

precedent, *see Garcia I*, 459 F.3d at 1062 (noting that "guns are often part of the gang environment" and that such a finding comports "with 'common sense and ordinary human experience'" (quoting *Alvarez,* 68 F.3d at 1244)). Deferring to the district court's findings of fact and viewing the record evidence in the light most favorable to its decision—here, in favor of the government, *see Canada*, 76 F.4th at 1307; *Samilton*, 56 F.4th at 823 n.2—the officers' knowledge of Mr. McGregor's gang membership supports a finding of reasonable suspicion that he was presently armed and dangerous. *See Garcia I*, 459 F.3d at 1062, 1067; *Hammond*, 890 F.3d at 907–08.

Crucially, multiple facts in the record establish that, at the time officers stopped his vehicle, they had a reasonable, objective basis for believing that Mr. McGregor was a contemporaneous or recent member of the Seanville gang. Officer Gruszeczka recalled seeing Mr. McGregor at two Seanville gang funerals "in the past year." R., Vol. II, at 13. Officer Gruszeczka had also viewed Mr. McGregor's social media activity and had previously conducted briefs and debriefs with known Seanville gang members, which led him to conclude that Mr. McGregor was a member of the Seanville gang. *See Torres*, 987 F.3d at 905 (noting police "believed [the defendant] to be a gang member"). Mr. McGregor's young age of twenty-four also implied that, at the very least, he was a recent gang member. And Officer Jaworowski had recognized Mr. McGregor as a local gang member from his knowledge base of "active" criminal street gang members. *See* R., Vol. III, at 60; *id.* at 137–38 (finding of court that Officer Jaworowski had

27

recognized Mr. McGregor "because he had seen photographs of him . . . in the intel database as a local gang member"); *see also Hammond*, 890 F.3d at 903 (involving a defendant who had been "flagged in the system as a documented gang member"). Together, these facts provided ample objective support for the officers to reasonably believe that Mr. McGregor was a contemporaneous or recent Seanville gang member.[14]

Mr. McGregor argues that the evidence of his gang membership was "exceptionally weak" and "vague." Aplt.'s Opening Br. at 30–31. But despite his arguments, he does not challenge any of the district court's findings regarding his gang membership as clearly erroneous. Since each of the district court's findings here had record support from the testimony of the officers, we are compelled to accept those findings. *See Canada*, 76 F.4th at 1307 (noting that we must "accept the district court's finding of fact unless clearly erroneous"); *Hernandez*, 847 F.3d at 1263 ("A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm

---

[14] Resisting this conclusion, Mr. McGregor argues there was no evidence that he was currently engaged in gang activity because he was not wearing gang colors at the time of the stop. But as we have shown, there were other facts in the record establishing that Mr. McGregor was a contemporaneous or recent member of the Seanville gang. Moreover, the wearing of gang colors is but one way to establish contemporaneous gang membership, and we have previously found alleged gang membership to support reasonable suspicion *in the absence* of gang colors being worn by the defendant. *See Torres*, 987 F.3d at 904–05 (finding reasonable suspicion for a pat-down search in part because "the police believed that [the defendant] was a gang member" notwithstanding the defendant's argument "that he was not wearing gang colors").

conviction that a mistake has been made." (quoting *In re Vaughn*, 765 F.3d at 1180)).

And although Mr. McGregor attacks the credibility of this evidence and minimizes

the weight it should be given, we defer to the trial court's assessment of these

matters. *See Hernandez*, 847 F.3d at 1263 ("[I]t is the province of the trial court to

assess the credibility of witnesses at the suppression hearing and to determine the

weight to be given to the evidence presented, and we must give such determinations

due deference." (quoting *Le*, 173 F.3d at 1264)).  Further, Officers Gruszeczka and

Jaworowski were both members of the Aurora Police Department's Gang

Intervention Unit, and we credit their expertise and ability to discern Mr. McGregor's

status as a Seanville gang member. *See Dennison*, 410 F.3d at 1207; *Hernandez*, 847

F.3d at 1263.

Accordingly, we give weight to Mr. McGregor's apparent contemporaneous

gang membership in our reasonable suspicion calculus.

<strong>c</strong>

We last consider Mr. McGregor's criminal history.  Specifically, the third and

final factor that the district court primarily relied on for its reasonable suspicion

finding was Mr. McGregor's own admission during the traffic stop that he was on

parole for robbery.  In its analysis, the district court noted that "robbery [is] a violent

crime."  R., Vol. III, at 142.

<strong>i</strong>

Mr. McGregor argues that, for criminal history to contribute to a reasonable

suspicion finding, "the suspect's prior convictions generally must tie him to

possession of, and propensity to use, a weapon." Aplt.'s Opening Br. at 25–26. He then reasons that his "prior conviction for robbery indicates neither that he possessed a weapon during the commission of the offense nor that he had a history of being armed and dangerous." *Id.* at 27.

The government responds that "[t]he critical inquiry is whether the defendant poses a risk of violence." Aplee.'s Resp. Br. at 18. It maintains that the officers "knew that [Mr.] McGregor was on parole for robbery, which the district court described, with no challenge from [Mr.] McGregor, as 'a violent crime.'" *Id.* at 19 (quoting R., Vol. III, at 142).

### ii

"[C]riminal history, combined with other factors, can support a finding of reasonable suspicion . . . ." *United States v. Artez*, 389 F.3d 1106, 1114 (10th Cir. 2004); *accord Santos*, 403 F.3d at 1132 ("[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus."). "Standing alone, a criminal record . . . 'is not sufficient to create reasonable suspicion of anything[.]'" *Hammond*, 890 F.3d at 906–07 (alteration in original) (quoting *Rice*, 483 F.3d at 1085). "But where[] . . . the circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions, that criminal history becomes critically relevant . . . ." *Id.* at 907. Our sister circuits have similarly given probative weight to criminal history in the reasonable suspicion calculus. *See, e.g., United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011) ("[W]e readily acknowledge that a person's possible involvement in prior criminal activity

(*i.e.*, 'caution data') can be relevant in establishing reasonable suspicion."); *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011) ("[W]e conclude that at the time they commenced the protective search the deputies reasonably could suspect that [the defendant] . . . was armed and presently dangerous. The deputies were aware that [the defendant] had a prior felony conviction and some sort of history involving drugs and violent behavior."); *United States v. Frierson*, 611 F. App'x 82, 86 (3d Cir. 2015) ("[T]he officers had reasonable suspicion to believe that [the defendant] was dangerous based on his violent [criminal] history and on their suspicion that he was engaged in drug trafficking.").

In *Hammond*, a defendant's prior arrest "in connection with [a] weapons case" interacted with other factors—including gang affiliation—to establish reasonable suspicion that the defendant was armed and dangerous. 890 F.3d at 907–08. Likewise, in *Garcia II*, 751 F.3d 1139, a defendant's prior armed robbery conviction "supported reasonable suspicion that [the defendant] was armed and dangerous." *Id.* at 1145. Drug-trafficking convictions can also support a reasonable suspicion finding. *See Garcia I*, 459 F.3d at 1064–66 (summarizing cases to conclude that "a connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous"); *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996) (including a defendant's drug-trafficking conviction in its totality-of-the-circumstances analysis to ultimately find reasonable suspicion in support of a frisk).

**iii**

We conclude that Mr. McGregor's prior robbery conviction lent significant support to a finding of reasonable suspicion that he was presently armed and dangerous.[15] During the traffic stop of his vehicle, Mr. McGregor admitted to the officers that he was on parole for robbery. And the district court correctly identified that robbery can be a violent crime in Colorado. *See, e.g.*, *United States v. Harris*, 844 F.3d 1260, 1270 (10th Cir. 2017) ("[W]hether by force, or by threats or intimidation, we conclude that robbery in Colorado has as an element the use or

---

[15] We acknowledge the government's contention that Mr. McGregor has waived any argument that his criminal history does not support a reasonable suspicion finding. *See* Aplee.'s Resp. Br. at 17. In making this contention, the government relies on our precedent articulating the waiver principle of Federal Rule of Criminal Procedure 12(c)(3)—specifically, *United States v. Bowline*, 917 F.3d 1227, 1236–38 (10th Cir. 2019). In applying Rule 12(c)(3), we have repeatedly held that "[the] waiver rule applies not only when a defendant fails to file any pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion that he did file." *United States v. Fernandez*, 24 F.4th 1321, 1328 (10th Cir. 2022) (quoting *United States v. White*, 584 F.3d 935, 948 (10th Cir. 2009)); *accord United States v. Augustine*, 742 F.3d 1258, 1265–66 (10th Cir. 2014). For his part, Mr. McGregor does not deny that he did not raise this specific criminal history argument before the district court; however, relying on our decision in *United States v. Murphy*, 100 F.4th 1184 (10th Cir. 2024), he claims nevertheless that he preserved it because "defendants do not waive appellate review of discrete theories that build upon broad arguments made before the district court." Aplt.'s Reply Br. at 2 (quoting *Murphy*, 100 F.4th at 1194). We note that we have never applied this proposition from *Murphy* in the Rule 12 context. Nevertheless, we need not pause to assess the merits of Mr. McGregor's preservation response. That is because, as discussed *infra*, his criminal history arguments are unavailing on the merits. And we have discretion to overlook any waiver by Mr. McGregor. *See, e.g.*, *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013) ("[T]he decision regarding what issues are appropriate to entertain on appeal in instances of lack of preservation is discretionary.").

threatened use of physical force against another person."). When Mr. McGregor's prior robbery conviction is viewed in tandem with the other factors present—that is, his furtive movement and his status as a gang member—his criminal history surely is relevant and significantly weighs in favor of a reasonable suspicion finding. *See Hammond*, 890 F.3d at 906–07 (explaining that criminal history "becomes *critically relevant*" in the reasonable suspicion calculus when "the circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions" (emphasis added)); *Santos*, 403 F.3d at 1132 (finding that, "in conjunction with other factors, criminal history *contributes powerfully* to the reasonable suspicion calculus" (emphasis added)).

Contrary to Mr. McGregor's assertion that criminal history can only support a reasonable suspicion determination that a suspect is armed and dangerous where that prior conviction itself involved a weapon, we have never held that a defendant's past conviction must include a weapon in order for it to be a viable factor in the reasonable suspicion calculus.[16] *See Garcia II*, 751 F.3d at 1145. In fact, we have

---

[16]    We recognize that a criminal conviction involving a weapon will typically *more* readily give rise to an inference of reasonable suspicion—that the subject of the conviction is armed and dangerous—than a circumstance where the prior conviction did not involve a weapon. *See Canada*, 76 F.4th at 1307; *Garcia II*, 751 F.3d at 1145 ("An officer's knowledge of past criminal conduct is probative of whether the defendant is armed and dangerous, *especially if a weapon was involved*." (emphasis added)). That proposition finds validation in "common sense and ordinary human experience." *Garcia I*, 459 F.3d at 1064 (quoting *Alvarez*, 68 F.3d at 1244). But that does not mean—in light of the totality of the circumstances of police-citizen encounters—that prior convictions not directly involving the possession or use of weapons are necessarily irrelevant on the question of whether there is reasonable suspicion to believe a suspect is armed and dangerous. And in light of the

previously recognized that convictions that are not directly predicated on the possession or use of firearms—such as drug-trafficking convictions—can nevertheless support a reasonable suspicion determination. *See, e.g.*, *Garcia I*, 459 F.3d at 1064–65 (citing in-circuit and extra-circuit authority to conclude that "a connection with drug transactions can support a reasonable suspicion that a suspect is armed and dangerous").

Though we ultimately find Mr. McGregor's robbery conviction probative of a reasonable suspicion finding, we emphasize that his robbery conviction alone would not have established the requisite reasonable suspicion to support the warrantless search of his vehicle. *See Hammond*, 890 F.3d at 906–07 ("Standing alone, a criminal record . . . 'is not sufficient to create reasonable suspicion of anything[.]'" (alteration in original) (quoting *Rice*, 483 F.3d at 1085)). Our rationale in this regard is clear:

> "If the law were otherwise, any person with any sort of criminal record . . . could be subjected to [an] investigative stop by a law enforcement officer at any time without the need for any other justification at all." To find reasonable suspicion in this case could violate a basic precept that law-enforcement officers not disturb a free person's liberty solely because of a criminal record. Under the Fourth Amendment our society does not allow police officers to "round up the usual suspects."

*United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006) (alteration in original) (citation omitted) (quoting *United States v. Sandoval*, 29 F.3d 537, 543

---

circumstances here, Mr. McGregor's prior conviction is relevant and weighs in favor of a reasonable suspicion finding.

(10th Cir. 1994)).  We instead reason that when officers are aware, as here, of an individual's prior robbery conviction—a crime of violence—that awareness, when filtered through specific circumstances present here, can weigh significantly in the reasonable suspicion determination.  *Cf. Hammond*, 890 F.3d at 906–07.

Therefore, Mr. McGregor's robbery conviction is a factor supporting the court's reasonable suspicion determination.

### d

We now decide, under the totality of the circumstances, whether the officers had reasonable suspicion to search Mr. McGregor's vehicle under the officer safety exception.  *Dennison*, 410 F.3d at 1207.  Based on the foregoing analysis, each of the three factors that the district court primarily relied upon—*viz.*, Mr. McGregor's furtive movement, his gang affiliation, and his criminal history—independently provide support for a finding of reasonable suspicion that Mr. McGregor was armed and dangerous.  We conclude that, viewed in the aggregate—along with the totality of the circumstances—these factors were indeed sufficient to establish the officers' reasonable suspicion that Mr. McGregor was presently armed and dangerous.

### i

Mr. McGregor argues to the contrary.  He maintains that "[a]t most, the officers had an inchoate hunch that Mr. McGregor had hidden 'something' based on his reach into the passenger side of the car."  Aplt.'s Opening Br. at 32.  He also contends that mitigating factors during the stop of his vehicle "dispel any reasonable suspicion that the officers might have had."  *Id.* at 18–19.  Conversely, the

35

government contends that "there is more than enough for reasonable suspicion under this Court's precedent" and analogizes the search of Mr. McGregor's vehicle to the search in *Canada*, where we affirmed the district court's reasonable suspicion finding.  Aplee.'s Resp. Br. at 11 (citing *Canada*, 76 F.4th at 1309).

### ii

Based on the totality of the circumstances, we conclude that the officers had reasonable suspicion that Mr. McGregor was armed and dangerous.[17]

The biggest factor weighing in the government's favor is the furtive movement made by Mr. McGregor as the officers stopped his vehicle.  As the officers testified, this movement was "dramatic," "frantic," "abrupt," and so excessive that one officer

---

[17]    The government argues that the length of time it took Mr. McGregor to stop his vehicle should be considered in the totality-of-the-circumstances analysis. The government contends that it took Mr. McGregor seventeen seconds to stop his vehicle and, as a result, his stop constituted a "slow roll."  In making this claim, the government attempts to directly pair the facts of Mr. McGregor's case with those in *Canada*, where we held that a defendant's furtive movements and his fourteen-second "slow roll" stop were sufficient to establish reasonable suspicion. *See* 76 F.4th at 1309.  But we decline the government's invitation to include the length of Mr. McGregor's stop in our analysis for the following two reasons.  First of all, during the suppression hearing, the two officers presented contradictory testimony on whether Mr. McGregor's stop was a "slow roll"—Officer Gruszeczka labelled the stop as a "slow roll" whereas Officer Jaworowski effectively rejected this label and instead characterized the stop as "abrupt[]."  *See* R., Vol. III, at 34, 68–69. Second, the district court did not include the length of Mr. McGregor's stop as a finding of fact or as a factor supporting its reasonable suspicion finding, and it similarly did not characterize the stop as a "slow roll."  Accordingly, due to the conflicting testimony regarding the length of Mr. McGregor's stop and the district court's failure to make a finding resolving the conflict, we do not factor the length of the stop into our totality analysis.  *Cf. Hernandez*, 847 F.3d at 1263 ("[I]t is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference." (quoting *Le*, 173 F.3d at 1264)).

could no longer see Mr. McGregor because he had leaned so far to the right; the officers thus felt the movement was an attempt to conceal or retrieve something— potentially a weapon. R., Vol. III, at 131, 137, 141–45. And the movement here was materially similar to the movement made by the defendant in *Canada*. *See* 76 F.4th at 1307 (finding the defendant made a furtive movement when he "reached behind his seat as the officers approached the vehicle" with his "hips lifted from the seat, arm extended, [and] head turned back").

Furthermore, when the officers approached the vehicle, their existing fears concerning their safety were heightened after they recognized Mr. McGregor was a member of a local gang because, as Officer Jaworowski put it, "in his experience most of the local gang members are armed." R., Vol. III, at 142; *see Garcia I*, 459 F.3d at 1066 (finding reasonable suspicion while crediting an officer's testimony that "guns are often part of the gang environment"); *Hammond*, 890 F.3d at 907–08 (reasoning that a defendant's status as a "known gang member" contributed to a finding of reasonable suspicion for a search pursuant to the officer safety exception). Then, Mr. McGregor's admission that he was on parole for robbery interacted with and bolstered their well-developed concerns that he could be armed and dangerous. *See Hammond*, 890 F.3d at 906–07 (finding criminal history probative when "the circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions"); *Santos*, 403 F.3d at 1132 ("[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus.").

As noted above, each of these factors considered independently supports a reasonable suspicion finding—though we do not view any one factor as determinative. Viewed collectively and in the broader context of the totality of the circumstances, we conclude that these three factors established the requisite reasonable suspicion for the officers to search Mr. McGregor's vehicle. *Cf. United States v. Navarro*, 756 F. App'x 702, 705 (9th Cir. 2018) (finding that an officer had reasonable suspicion to conduct a pat-down search because he "drew upon his personal experience and personal knowledge of [the defendant's] *gang membership* and *criminal history* and observations of [the defendant's] *furtive movements* inside the sedan" (emphasis added)). When considered together, these three factors gave the officers far "more than an inchoate and unparticularized suspicion or hunch" that Mr. McGregor was "presently dangerous" and was hiding a "weapon[] . . . in the vehicle." *Canada*, 76 F.4th at 1307–08 (first quoting *Hauk*, 412 F.3d at 1186; then quoting *Long*, 463 U.S. at 1047; and then quoting *Dennison*, 410 F.3d at 1212). Especially in light of the low bar for a reasonable suspicion determination, we conclude that these three factors, viewed collectively and in the light of the totality of the circumstances, provided a solid foundation for the district court's ruling.[18] *See*

---

[18] We note that the officers' stop of Mr. McGregor's vehicle lacked many aggravating factors that we have previously found probative of a reasonable suspicion finding. *Contrast Guardado*, 699 F.3d at 1225 (finding probative of reasonable suspicion that a defendant was "spotted in a high-crime area, late at night[]"), *and Garcia II*, 751 F.3d at 1145 (finding "a nighttime stop in a sparsely travelled area" to be probative of reasonable suspicion), *with* R., Vol. III, at 134 ("[T]he area where the traffic stop took place is a residential area. It's open. There aren't a lot of trees around. It's still light at that time of day."). But based on the

*Samilton*, 56 F.4th at 827 (stating that reasonable suspicion "is not meant to be[] an onerous standard" (quoting *Shaw*, 36 F.4th at 1014)); *id.* (noting "[t]he level of suspicion required is considerably less than proof by a preponderance of the evidence or that required for probable cause" (quoting *Chavez*, 660 F.3d at 1221)).

To be sure, Mr. McGregor alleges that other surrounding circumstances that the district court did not rely on in its reasonable suspicion determination undercut the foundation for that determination. Specifically, he states that "the stop occurred during daylight hours in a peaceful, residential neighborhood; that Mr. McGregor was polite and cooperative during the entire encounter; that Mr. McGregor told officers he did not have weapons in his vehicle and a pat-down search confirmed he did not have weapons on his person; and that he was outnumbered by officers four to one."[19] Aplt.'s Opening Br. at 18–19.

While some of these factors certainly weigh (even if only modestly) in Mr. McGregor's favor, they do not lead us to conclude that the officers lacked reasonable suspicion. For example, we have previously found reasonable suspicion

---

totality of the circumstances, we nonetheless find reasonable suspicion here as a result of the three aforementioned factors.

[19]    The government notes that two of the alleged factors that Mr. McGregor raises—specifically, the time and location of the stop and the number of officers present—were not argued by Mr. McGregor below and should thus be deemed waived. The government is correct that these arguments were not raised below. However, on the merits, Mr. McGregor's reliance on these factors is without merit. And we have the discretion to overlook any waiver by Mr. McGregor in this regard. *See, e.g.*, *Abernathy*, 713 F.3d at 552; *see supra* note 15.

even when a stop occurred during daytime hours in a residential neighborhood. *See Torres*, 987 F.3d at 904 (upholding a pat-down search despite the defendant's argument that "the traffic stop occurred in the middle of the day in a residential neighborhood"). We have similarly found that a defendant's compliance and cooperation with officers do not undercut the probative weight of other factors.[20] *See Canada*, 76 F.4th at 1309 ("Compliance[] . . . has not precluded protective sweeps in other cases."); *Torres*, 987 F.3d at 904 ("[T]he pleasant tone didn't eliminate the risk that [the defendant] might resort to violence to prevent a pat-down search."); *Garcia I*, 459 F.3d at 1067 ("Although [compliance] likely helped avoid escalating an already tense situation, we conclude that it did not eliminate the officers' reasonable suspicion that one or more of the persons present in the front room was armed and dangerous . . . ."). And finally, an increased number of police officers does not necessarily undermine officers' reasonable belief that a suspect is armed and dangerous. *See Hammond*, 890 F.3d at 907 ("[W]e have never said, nor do we today, that a second officer's presence and ability to 'cover' the first officer eliminates a suspect's supposed dangerousness.").

In sum, while these additional factors that Mr. McGregor has identified may weigh in his favor on the question of whether there was a reasonable basis to suspect

---

[20]     In its findings of fact, the district court did not state that Mr. McGregor was "polite and cooperative," as Mr. McGregor suggests on appeal. Aplt.'s Opening Br. at 19. Instead, the district court only found that Mr. McGregor "at no point appear[ed] to be scared or nervous" and that, "[i]n fact, [he] fe[lt] comfortable" when speaking to the officers. R., Vol. III, at 135.

that he was armed and dangerous, they do not alter our ultimate conclusion that the officers had such reasonable suspicion—when the three factors that the district court relied on are viewed collectively and in the context of the totality of the circumstances.

Accordingly, for the foregoing reasons, we conclude that the officers had reasonable suspicion that Mr. McGregor was armed and dangerous such that their warrantless search of his vehicle was permissible under the officer safety exception to the Fourth Amendment.  And the district court did not err in its ruling to this effect.

**B**

Mr. McGregor raises both a facial and as-applied challenge to 18 U.S.C. § 922(g)(1)—the statute defining the offense to which he pleaded guilty.[21]  At the time he filed his appeal, Mr. McGregor recognized that "Second Amendment challenges to [§] 922(g)(1) are currently disallowed under Tenth Circuit precedent." Aplt.'s Opening Br. at 36 (citing *Vincent v. Garland* ("*Vincent I*"), 80 F.4th 1197 (10th Cir. 2023)).  He therefore challenges the constitutionality of the statute for "preservation only, for future review before this Court in an en banc proceeding or before the Supreme Court." *Id.* at 37.

---

[21]    Mr. McGregor requests plain error review for this challenge, acknowledging that he failed to make this argument before the district court.

41

Viewed in this light, Mr. McGregor's constitutional challenge is without merit. As Mr. McGregor points out, in *Vincent I*, we held that § 922(g)(1) was constitutional. 80 F.4th at 1202. Furthermore, during the pendency of this appeal, we issued *Vincent v. Bondi* ("*Vincent III*"), 127 F.4th 1263 (10th Cir. 2025), in which we readopted our prior opinion in *Vincent I*. *Id.* at 1266. This action followed the Supreme Court's vacatur of our *Vincent I* decision for reconsideration in light of *United States v. Rahimi*, 602 U.S. 680 (2024). *See Vincent v. Garland* (*Vincent II*), --- U.S. ----, 144 S. Ct. 2708 (2024) (mem.). At bottom then, Mr. McGregor's challenge to the constitutionality of 18 U.S.C. § 922(g)(1) is foreclosed by our precedent—as it was when he initially filed his appeal—and we thus reject it.

## III

For the foregoing reasons, we **AFFIRM** the district court's order denying Mr. McGregor's motion to suppress and the court's judgment.